# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
CATHERINE GERTRUDE McCABE,    *
                              *    No. 13-570V
            Petitioner,       *    Special Master Christian J. Moran
                              *
v.                            *    Filed: August 2, 2019
                              *
SECRETARY OF HEALTH           *    Attorneys' fees and costs,
AND HUMAN SERVICES,           *    reasonable basis, good faith.
                              *
            Respondent.       *
* * * * * * * * * * * * * * * * * * * *
```

<u>Clifford Shoemaker</u>, Shoemaker, Gentry & Knickelbein, Vienna, VA, for petitioner;
<u>Glenn MacLeod</u>, United States Dep't of Justice, Washington, DC, for respondent.

### PUBLISHED DECISION DENYING PETITIONER'S MOTION FOR ATTORNEYS' FEES AND COSTS[1]

On May 17, 2018, the undersigned issued a decision dismissing Ms. McCabe's petition. On December 5, 2018, Ms. McCabe filed a timely motion for final attorneys' fees and costs, requesting $186,645.23.

For the reasons set forth below, the undersigned finds that Ms. McCabe did not have a reasonable basis to maintain her petition and that the litigation was not

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

maintained in good faith. Thus, petitioner is ineligible for an award of attorneys' fees and costs.

## I.   **Procedural History**

The facts of Ms. McCabe's petition are laid out, with substantial detail, in the decision denying entitlement. See Decision, issued May 17, 2018, 2018 WL 3029175, at *1-36. That history is adopted here and for brevity need not be restated in full. Instead, only a brief recounting of the procedural history is provided.

In her most recent petition, Ms. McCabe claimed that an influenza vaccination that she received on September 11, 2010, "caused her to have Chronic Fatigue Syndrome and/or significantly aggravated a preexisting condition resulting in [Chronic Fatigue Syndrome]." Am. Pet., filed Apr. 17, 2017, at ¶ 11.

However, chronic fatigue syndrome ("CFS") is not the disease for which Ms. McCabe originally sought compensation. In her first petition, Ms. McCabe merely alluded to "numerous health issues" caused by the vaccine. See Pet., filed Aug. 12, 2013, at ¶ 3. In an affidavit filed approximately a month later, Ms. McCabe clarified that she got very tired the afternoon following the vaccination, fell asleep and did not wake up until the next morning. Exhibit 9 at ¶ 4-7. She stated that the next morning she suffered from "crazy pain" in her back and legs, sore and swollen legs, dizziness, loss of balance, difficulty walking, and cognitive issues including memory loss. Id. at ¶ 8-14.

Nine months later, Ms. McCabe filed another affidavit clarifying the nature of her injury and how it has affected her. She stated: "I believe that this vaccination caused me to suffer GBS, nerve damage, sleeping problems, chronic inflammatory respiratory problems, memory loss and walking problems." Exhibit 13 at ¶ 7. Shortly thereafter, Ms. McCabe amended her petition to claim that she suffered from a "demyelinating condition" caused or significantly aggravated by the September 11, 2010 flu vaccine. See Am. Pet., filed Oct. 2, 2014, at ¶ 3. Fatigue was not mentioned in the affidavit or amended petition.

In support of her initial claim, Ms. McCabe filed an expert report from Dr. David Axelrod on October 27, 2014. Dr. Axelrod, an immunologist, opined that an immune response to the vaccine "resulted in damage/dysfunction of her brain related to her anxiety and depression or the damage/dysfunction of her brain resulted in a new brain demyelinating disease that caused her new symptoms that developed subsequent to her September 11, 2010 influenza vaccination." Exhibit 16 at 3. Fatigue was never mentioned in the report.

In May 2015, Ms. McCabe's first counsel communicated that he was going to transfer Ms. McCabe's case to substitute counsel.  See order, issued May 28, 2015.  As part of this substitution, Ms. McCabe sought an award of interim fees.  The parties were able to agree to a stipulation for fees on June 22, 2015.  In the stipulation, petitioner's counsel explained that he was facing "serious health issues" and that, given "the particular circumstances presented" the government had agreed to "not raise her objections under Avera and Section 15(e)(1)."  Stipulation, filed June 22, 2015, at 2.  The undersigned interpreted this stipulation to reflect a professional courtesy by the Secretary to Ms. McCabe's original attorney so that he could be compensated in the face of his health issues while Ms. McCabe's case proceeded without him.

Citing the parties' stipulation, the undersigned awarded Ms. McCabe interim fees.  The decision explicitly cited Dr. Axelrod's report in support of the reasonable basis of Ms. McCabe's petition.  Interim Fees Decision, issued June 26, 2015, 2015 WL 4480923, at *1.  Ms. McCabe's good faith for bringing the petition was not questioned.

At the same time that the interim fees motion was submitted and being adjudicated, the Secretary challenged Dr. Axelrod's opinion that Ms. McCabe suffered from a neurological injury following the flu vaccine.  His expert, Dr. Leist—who, unlike Dr. Axelrod, is a neurologist—pointed out that examinations by several different physicians, including neurologists, who treated Ms. McCabe did not identify any findings evincing a neurological injury.  See exhibit A at 9.  Among these were neurological examinations by Dr. Herbstein (exhibit 1 at 106), the NYU emergency department (exhibit 2 at 7), Dr. Forster (exhibit 8 at 8), and Dr. Sivak (exhibit 8 at 11).

As a result of the lack of medical record evidence evincing a neurological injury, Ms. McCabe then spent nearly a year attempting to find a neurologist that could substantiate her and Dr. Axelrod's allegations that she was suffering from a demyelinating disorder.  See Decision, 2018 WL 3029175, at *14.  This search was unsuccessful, and she instead elected to pivot towards the claim that she suffered from cytokine release syndrome.  Id. at *14-15.

The diagnosis of cytokine release syndrome, a condition sometimes suffered as a result of immunotherapy treatments for cancer, was made by Ms. McCabe's second expert witness, Judy Mikovits.  Ms. Mikovits is not a medical doctor.  Although this case was one of her earlier appearances in the Program, Ms. Mikovits has since developed a pattern of submitting substandard work and her credentials as an expert have been called into question.  See Dominguez v. Sec'y of

Health & Human Servs., No. 12-378V, slip op. at 16-20 (Fed. Cl. Spec. Mstr. June 24, 2019) (concluding, after a review of Ms. Mikovits' performance as an expert witness in this Program, that she is not suitable as an expert witness); McKown v. Sec'y of Health & Human Servs., No. 15-1451V slip op. at 27, 63-64 (Fed. Cl. Spec. Mstr. July 15, 2019). As detailed in the decision denying compensation, Ms. Mikovits would often make things up. As just one example, Ms. Mikovits stated that Ms. McCabe experienced "progressive encephalopathy and hypothalamic brain degeneration and peripheral neuropathy" following each administration of a flu vaccine since 2007. Exhibit 40 at 8. This, as with many of Ms. Mikovits' statements, was baseless. See Decision, 2018 WL 3029175, at *17. Ms. Mikovits' reliance on misdirection was not limited to her opinions regarding the case, they were also used to buttress her own credentials as an expert witness. See Decision, 2018 WL 3029175, at *26.

The shift away from a neurological injury to cytokine release syndrome necessitated the Secretary retaining an expert in immunology since his previous expert, Dr. Leist, was a neurologist. The Secretary retained Dr. Lindsay Whitton, an immunologist, to respond to Ms. Mikovits' claim of cytokine release syndrome. Dr. Whitton concluded that the evidence did not support Ms. Mikovits' claim and criticized her willingness to provide medical diagnoses when the medical doctors that examined and ran diagnostic tests on Ms. McCabe came to very different conclusions. See exhibit C.

Ms. McCabe did not spend long claiming that she suffered from cytokine release syndrome. Within a few months of the reports from Ms. Mikovits and Dr. Whitton, Ms. McCabe pivoted again toward a new claim: that she suffered from chronic fatigue syndrome. See Decision, 2018 WL 3029175, at *20. Ms. McCabe submitted a report from Dr. Susan Levine to buttress that claim. Exhibit 59. She also amended her petition to claim that she was entitled to compensation because the vaccine caused her to develop CFS or significantly aggravated her CFS. See Am. Pet., filed Apr. 17, 2017, at ¶ 11. A few months later, Ms. McCabe filed another affidavit, this time stating that she was very active prior to the 2010 vaccination, with no problems with her stamina and was "always on the go." Exhibit 91 at ¶ 4. This time, she also included in her assessment of her current condition that she suffered from "extreme fatigability." Id. at ¶ 16.

The shift to CFS necessitated the Secretary finding yet another expert, this time Dr. Mehrdad Matloubian, to address her claim that she suffered from this new diagnosis. Dr. Matloubian, a rheumatologist and internist, opined that Ms. McCabe did not meet the diagnostic criteria for CFS. See exhibit H. This was not altogether surprising, since no treating physician ever diagnosed Ms. McCabe with

4

CFS, as was the case with her previous allegations of a demyelinating injury and cytokine release syndrome.  See Decision, 2018 WL 3029175, at *17. Furthermore, Dr. Matloubian opined that there was no evidence that flu vaccines could cause CFS.  Exhibit H at 4-10.

In the year prior to the hearing, Ms. McCabe submitted a total of four reports from Dr. Levine on the issue of Ms. McCabe's putative CFS and the claimed causal role that her flu vaccination(s) played in causing it.  As detailed in the decision, these reports were largely nonsensical and replete with non-sequiturs. See Decision, 2018 WL 3029175, at *21-34.  Time after time, the undersigned explained that Dr. Levine had a somewhat simple task for her reports.  For her reports to be persuasive, she had to: 1) identify a set of diagnostic criteria for CFS, 2) explain what diagnostic criteria for CFS Ms. McCabe met, 3) explain how Ms. McCabe met the diagnostic criteria, 4) explain her basis for concluding that Ms. McCabe's putative CFS got worse after the September 11, 2010 vaccination, and 5) explain why it is logical to conclude that Ms. McCabe's CFS arose from the flu vaccination.  See id.  Despite being provided with numerous chances to fix the issues in her reports, she never did.   Id.

In the months leading up to the hearing on entitlement, the undersigned repeatedly conveyed substantial concerns about Ms. McCabe's proof.  See order, issued Apr. 20, 2017 (indicating that the April 17, 2017 petition was adequate for pleading purposes but did not reference the foundational basis for the assertions); order, issued Aug. 1, 2017 ("In short, from a review of the reports from the petitioner's experts, it appears that petitioner's case may not be complete and may not be coherent"); order, issued Aug. 17, 2017 ("the undersigned is concerned that Ms. McCabe may lack a reasonable basis to proceed to a hearing"); order, issued Aug. 31, 2017 ("The undersigned remains concerned that Ms. McCabe's case contains significant gaps and weaknesses with respect to multiple elements"); order for pretrial briefs, issued Aug. 31, 2017 (referencing the April 20, 2017 order with the same concern) ("Ms. McCabe has yet to present a comprehensive account of the relevant facts of her health"); order, issued Oct. 10, 2017 ("based on the submitted record, the undersigned is concerned about whether or not a reasonable basis for petitioner's claim exists. The undersigned is concerned both as to the diagnosis of CFS and the claim of causation-in-fact."); see also Decision, 2018 WL 3029175, at *11-35 (reviewing the procedural history of this case and the numerous concerns conveyed along the way).

By the time the hearing was nigh, Ms. McCabe's response to these numerous concerns was to look for assurances that if she were to proceed to a hearing, her attorneys would be paid.  On October 6, 2017 she moved for the

undersigned to determine whether there was a reasonable basis for proceeding to a hearing.  In this atypical motion, she cited a concern about moving forward to a hearing without a guarantee that the Vaccine Injury Trust Fund would pay the costs.  Without such a guarantee, proceeding to a hearing would be "cost prohibitive and an undue hardship."  Pet'r's Mot., filed Oct. 6, 2019.  In the alternative, Ms. McCabe suggested that the expert testimony portion of the hearing be cancelled, with the hearing proceeding only to receive testimony from Ms. McCabe.  Id.

The undersigned denied Ms. McCabe's request to guarantee reimbursement of costs associated with the hearing on the basis that a prospective assessment of reasonable basis was premature.  Order, issued Oct. 11, 2017, at 2.  The undersigned also concluded that delaying the hearing at this late stage of the proceeding was not fair to the Secretary or to the Program since the hearing was set for dates the petitioner and the Secretary requested, and the undersigned had spent months preparing to hold the hearing on those dates.  Id.  Ms. McCabe ultimately decided to proceed to a hearing so that her case for entitlement could be heard.  Pet'r's Status Rep., filed Oct. 13, 2017.

## II.    **The Hearing on Entitlement and Decision Denying Compensation**

A three-day hearing was held on October 18-20, 2017.  Five expert witnesses from across the country and Ms. McCabe herself testified over the course of the proceeding.

The hearing did not help Ms. McCabe's case.  As noted in the decision denying entitlement, Ms. McCabe provided statements at the hearing that directly contradicted other testimony provided in this case and her own medical records.  Decision, 2018 WL 3029175, at *44-46.  The inconsistent statements were not minor issues that could be chalked up to the passage of time and the frailties of human memory, but instead involved central aspects regarding the characterization of her condition and how it affected her.  Id.  Beyond the inconsistencies, Ms. McCabe provided testimony that simply did not ring true and instead appeared coached and directed by counsel.  Id. at 46.

Ms. McCabe's expert witnesses fared little better.  The expert opinions provided by Dr. Levine and Ms. Mikovits did not stand up to scrutiny and the experts were repeatedly unable to answer simple questions about the factual bases for their conclusions.  This included questions as simple as on what information Dr. Levine relied to conclude that Ms. McCabe was currently experiencing disabling symptoms relating to CFS.

Q. When you say her current disabling symptoms, you know, I'm thinking of current as of April 2017, something like that. You know, current as of when you wrote the report. What were you thinking of as her current disabling symptoms?

A. I guess the ones -- the last ones that were spoken about in my written -- in the records I received, which I think might have ended -- I don't recall now, but whenever -- because I hadn't met the patient, so I didn't know how she was doing –

Tr. 450.

On May 17, 2018, the undersigned issued a decision denying Ms. McCabe compensation.  The decision reviewed multiple aspects of Ms. McCabe's claim in detail.  The length of the decision did not reflect the complexity of Ms. McCabe's case, but the number of problems with Ms. McCabe's proof.  Among other conclusions, the undersigned found the following:

1. Ms. McCabe was not a credible witness.  Her testimony presented several glaring inconsistencies regarding her medical history and she provided testimony that did not ring true.  Decision, 2018 WL 3029175, at *44-46.

2. Ms. McCabe did not satisfy any published criteria for CFS.  Dr. Levine emphasized the importance of "unrefreshing sleep" in her diagnosis of Ms. McCabe with CFS.  This was notable since there was no evidence beyond Ms. McCabe's testimony at the hearing that she experienced unrefreshing sleep as opposed to difficulty falling asleep (a symptom reported in Ms. McCabe's medical records dating back to the very first visit in the record, in 2006).  Id. at *36-42.

3. The medical records filed by Ms. McCabe show no discernable change in the severity or frequency of her complaints of fatigue, depression, or insomnia before and after the 2010 flu vaccine (or any other vaccine).  The undersigned prepared the following chart to summarize the pertinent aspects of the medical records:

7



Id. at *42-44.[2]

4.  Ms. McCabe's work records show that, if anything, Ms. McCabe *increased* the amount she worked following the 2010 flu vaccine.  Id.

5.  Ms. McCabe's expert witnesses were not credible experts and presented wholly unpersuasive expert testimony that often mischaracterized the underlying record.  Id. at *46-59.

The decision concluded by remarking that "The evidence does not support that Ms. McCabe has the disorder she claims she has.  In fact, the evidence does not support that she had a change in health following the flu vaccine at all.  For those reasons alone, Ms. McCabe's petition for compensation must fail."  Although superfluous given the absence of any cognizable injury, the undersigned

---

[2] This figure presents all incidents of Ms. McCabe reporting depression, insomnia, fatigue, or receiving a B12 shot during her visits to her primary care physician (PCP).  The dates range from the first submitted record from October 2, 2006 (four years before the 2010 vaccination) to the end of 2014 (four years after the 2010 vaccination).  The documented flu shots are indicated by vertical dashed lines, with the right-most one representing the September 11, 2010 shot.  Ms. McCabe received B12 shots to address her fatigue.  See Tr. 64 ("Lack of sleep and tiredness. I had been very tired. Now, I don't know if that's been ten years ago or if it's from the flu vaccine, but I am just constantly tired. So that's why I was getting B12 shots, to give me energy").

also found that "Ms. McCabe did not present a plausible theory for how a flu vaccine can cause the injury she alleges she has and she cannot explain how the facts in her case are consistent with this theory.  In short, nothing in petitioner's case supports a finding of causation."  Id. at *59.

### III.    Petitioner's Fees Motion and the Parties' Arguments

On December 5, 2018, Ms. McCabe moved for final attorneys' fees and costs.  Ms. McCabe requested $113,034.65 in fees and $73,610.58 in costs. Despite the numerous concerns about reasonable basis raised during the proceeding and the decision on entitlement, which remarked explicitly on the total absence of evidence supporting Ms. McCabe's claim, Ms. McCabe did not support her motion for fees and costs with any argument for why her claim was supported with reasonable basis.

The Secretary, however, did address the reasonable basis issue in his response.  See Resp't's Resp., filed Mar. 22, 2019.  He argued that Ms. McCabe lost reasonable basis for her petition when his expert, Dr. Thomas Leist, filed his responsive report on February 20, 2015.  Id. at 1.  The Secretary states that at that juncture "it became clear that petitioner was unable to support her initial vaccine injury claim of a demyelinating injury with medical records or credible medical opinion."  Id. at 3.  What was notable, in the Secretary's opinion, was that Dr. Leist—who was the only neurologist that testified in this case—was able to refute the unsupported conclusion from Dr. Axelrod that Ms. McCabe had any neurological injury.  Id.  Dr. Leist's conclusion regarding the absence of a neurological injury in Ms. McCabe was consistent with the opinions of her treating neurologists, who found Ms. McCabe to be neurologically normal.  Decision, 2018 WL 3029175, at *39.  The Secretary further argued that after Ms. McCabe's claim of a demyelinating condition was debunked by an appropriately credentialed expert, she continued to transition to new claims despite an absence of evidence supporting those new claims.  See Resp't's Resp., filed Mar. 22, 2019, at 4-6.

Ms. McCabe filed reply briefs on May 13, 2019 and May 17, 2019.[3]  Ms. McCabe's argument repeatedly emphasized the undersigned's award of interim fees on June 26, 2015, specifically where the undersigned found that Dr. Axelrod's

---

[3] Ms. McCabe's second reply addressed the evidence supporting Ms. McCabe's claim that her overall condition changed following the vaccination, an analysis which was inadvertently omitted from her first reply.  See order, issued May 17, 2019.

report satisfied the reasonable basis requirement.  Pet'r's Reply, filed May 13, 2019, at 2, 7, 10; Pet'r's Second Reply, filed May 17, 2019, at 13.

Ms. McCabe also stressed the sheer number of expert reports she filed as part of her petition, noting: "At the conclusion of the case (and hearing), Ms. McCabe had submitted an additional seven expert reports from two primary experts, Judy Mikovits, PhD and Susan Levine, MD, with Dr. Mikovits submitting three reports (Pet. Ex.'s 40, 58, and 81) and Dr. Levine submitting four reports (Pet. Ex.'s 59, 72, 80, and 90)."  Pet'r's Reply, filed May 13, 2019, at 3.  Ms. McCabe also noted that several of these reports were "in direct response to concerns and questions raised by the Special Master or in direct response to report written by the Respondent's experts."  Id.

Ms. McCabe's brief also takes issue with the fact that the undersigned did not raise questions about the reasonable basis of the petition until August 17, 2017.  Pet'r's Reply, filed May 13, 2019, at 4.  Even then, petitioner argues, the undersigned only communicated concerns about Ms. McCabe's reasonable basis to "proceed to a hearing and whether any fees and costs incurred during the hearing or related to hearing would be 'at risk'."  Id. at 6.  She continues: "none of the discussions were about the state of Ms. McCabe's reasonable basis since the current counsel entered his appearance, however that, is precisely what is alleged by the Respondent in their opposition to Petitioner's fees."  Id.  In this way, petitioner appears to be arguing that she was blindsided by the Secretary's argument that her petition may not be supported by reasonable basis and that the Secretary's position is, at its core, unfair.

Ms. McCabe submitted a supplemental brief that specifically addressed the objective evidence underlying Ms. McCabe's assertion that she suffered a degradation in her condition following the 2010 flu vaccination.  In this supplement, petitioner referenced her own affidavits to say that prior to the 2010 vaccination, "she was working and was active. She was stable, and her conditions were controlled with medications. She enjoyed hiking, dancing, and reading.  She worked at a hardware store and as a home health aide. Her life was full and active." Pet'r's Second Reply, filed May 17, 2019, at 5 (citing exhibits 9, exhibit 13, exhibit 91).

Ms. McCabe concluded her argument by stating that reasonable basis exists because she "has provided a complete medical record, multiple expert reports, a VAERS report from a treating doctor, substantial evidence, including testimony from the former Chair of the Advisory Committee on CFS, supporting her diagnosis of CFS, and substantial literature in support of her claim."  Id. at 14-15

10

## IV.   Standards for Adjudication

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa—15(e)(1). As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard. Id.; Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). In the vaccine program, "good faith" is often not litigated and is almost always found if a petitioner honestly believes that a vaccine injury occurred. Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).

In contrast to good faith, reasonable basis is purely an objective evaluation of the weight of the evidence. Simmons, 875 F.3d at 636. Because evidence is "objective," the Federal Circuit's description is consistent with viewing the reasonable basis standard as creating a test that petitioners meet by submitting evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), mot. for rev. denied, 116 Fed. Cl. 276 (2014).

The Federal Circuit and judges of the Court of Federal Claims have provided some guidance as to what reasonable basis is *not*. A petition based purely on "unsupported speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis. Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994). The background to Perreira comes from a 1991 decision denying compensation. The Perreiras alleged that a 1982 administration of the diphtheria-tetanus-pertussis ("DTP") vaccine harmed their daughter, Carly. Initially, the Perreiras maintained that Carly started having seizures four days after the second dose of DTP, based upon the testimony of Carly's mother. The former Chief Special Master found that Ms. Perreira's testimony was not correct and found, instead, that the seizures started 20 days after the second dose of DTP. Perreira v. Sec'y of Health & Human Servs., No. 90-847V, 1991 WL 117740, at *1 & n.2 (Cl. Ct. Spec. Mstr. June 13, 1991).

11

Given this sequence of events, the Perreiras attempted to establish a significant aggravation claim. This alternative claim was based upon the sequence that two weeks after the third dose of DTP, Carly had more seizures. The former Chief Special Master rejected the Perreiras' claim because there was no support for their expert's opinion that DTP causes harm that would first appear two weeks later. Id.

After the entitlement proceedings concluded, the Perreiras sought an award for their attorneys' fees and costs. The former Chief Special Master found that the Perreiras had a reasonable basis for filing their petition. Perreira v. Sec'y of Health & Human Servs., No. 90-487V, 1992 WL 164436, at *2 (Cl. Ct. Spec. Mstr. June 12, 1993). The decision does not state the reason for finding reasonable basis.

The former Chief Special Master also explicitly found, however, that the reasonable basis ceased after the expert submitted a report, noting that the expert's theory "amounted to his own unsupported speculation[,]" and that the Perreiras' attorney should have recognized that the expert's theory "was legally insufficient to establish causation." The former Chief Special Master also stated that the Perreiras' attorney recognized that this case "was a 'bad case.'" Id. at *1-2.

The Perreiras filed a motion for review of the denial of a portion of the attorneys' fees and costs. The Court of Federal Claims found that the former Chief Special Master's determination that the case lacked a reasonable basis was not arbitrary. The Court of Federal Claims rejected the petitioners' arguments, including an argument that "counsel had an absolute right to rely on the expert's opinion in pursuing the case." Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 33 (1992).

These decisions are the background for the Federal Circuit's discussion of "reasonable basis" in its Perreira opinion. The Federal Circuit affirmed the former Chief Special Master's decision that the Perreiras lacked a reasonable basis to proceed to a hearing, despite an expert report, because "the expert opinion was grounded in neither medical literature nor studies." The Federal Circuit explained that "[t]he special master did not require counsel to verify the validity of the expert's opinion, but only required the opinion to be more than unsupported speculation." Perreira, 33 F.3d at 1377.

Perreira demonstrates that special masters enjoy discretion to find that a claim lacked a reasonable basis when the evidence on which a petitioner relies (there, an expert's report) is rooted in unsupported speculation. In this context, the Federal Circuit seemed to give some teeth to the term "reasonable basis." The

Federal Circuit declared: "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion." 33 F.3d at 1377.

Another example of a case exemplifying a deeper than skin-deep look at reasonable basis is an early case from the Vaccine Program, Murphy v. Sec'y of Health & Human Servs., No. 90-882V, 1991 WL 74931 (Cl. Ct. Spec. Mstr. Apr. 25, 1991). Today, Murphy is often cited as a well-known case in which a special master weighed the value of medical records created contemporaneously with the events the medical records described against the value of affidavits created many years later. The special master found that the medical records were more reliable, 1991 WL 74931 at *5, and the Claims Court ruled that this finding was not arbitrary. 23 Cl. Ct. 726, 734 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992). Under the representations presented in the contemporaneously created medical records, the petitioners in Murphy were not entitled to compensation.

A less recognized aspect to Murphy is the ensuing motion for attorneys' fees and costs, which is more relevant to the case at hand. Although the special master's 1993 decision denying an award of attorneys' fees and costs is unpublished, the opinion on a motion for review states the special master found a lack of reasonable basis because "the medical records and other written records contradict the claims brought forth in the petition." 30 Fed. Cl. 60, 61 (1993). Upon a motion for review, the petitioners argued that the special master abused his discretion in denying attorneys' fees and costs. More specifically, the petitioners argued that "because they submitted expert opinion to support their claim, they had a reasonable basis for their case as a matter of law." Id. at 62.

The Court, however, rejected the petitioners' argument and ruled that the special master was not arbitrary in finding a lack of reasonable basis. The Court reasoned that an expert report premised on unreliable assertions does not confer reasonable basis:

> [The petitioners'] position assumes that special masters rely upon expert testimony without determining whether it is corroborated by the facts. This position is not plausible, as expert testimony in and of itself does not determine reasonableness. . .. [T]he expert opinion submitted by petitioners was founded upon Mrs. Murphy's version of the events, a version found to be unreliable by the special master.

Id. at 63.

Together, <u>Murphy</u> and <u>Perriera</u> teach that expert testimony is not sufficient for reasonable basis to be conferred. Something more is required. At the least, this includes a requirement that experts provide opinions rooted in more than speculation, and that the claims of the petition not be contradicted by the evidentiary record. Although the exact quantum of evidence has not been defined, it is also now well-established that the burden is on petitioners to marshal the evidence that supports the reasonable basis of the petition to be awarded reasonable fees and costs incurred on the petition. <u>Carter v. Sec'y of Health & Human Servs.</u>, 132 Fed. Cl. 372, 379 (2017) (citing <u>Woods v. Sec'y of Health & Human Servs.</u>, 105 Fed. Cl. 148, 152 (2012) and <u>McKellar v. Sec'y of Health & Human Servs.</u>, 101 Fed. Cl. 297, 305 (2011)). The burden of establishing reasonable basis is to present some quantum of evidence that is lower than the preponderance of evidence standard.

## V.   **Analysis**

Although the current fees motion does not cover compensation for the earliest stages of Ms. McCabe's petition—that portion of the fees and costs were awarded in the June 26, 2015 interim fees decision—revisiting the beginning of this proceeding provides context for understanding the trajectory of Ms. McCabe's case, and why it does not present a petition that was pursued with a reasonable basis and in good faith.

### A. Ms. McCabe's Initial Claim of a Demyelinating Disease

Ms. McCabe entered the Vaccine Program averring that she suffered a demyelinating injury, one she characterized as causing her "GBS, nerve damage, sleeping problems, chronic inflammatory respiratory problems, memory loss and walking problems." Exhibit 13 ¶ 7. Ms. McCabe was able to substantiate these claims with an affidavit she submitted detailing how, following the September 11, 2010 vaccination, she suffered fatigue, pain in her back and legs, sore and swollen legs, and memory loss. She was also able to substantiate her claims by providing medical records showing that she visited an emergency department at NYU 11 days after vaccination. At this visit, she reported a history of feeling "weak, fatigued, and achy" immediately following the vaccination. Exhibit 2 at 6.

Ms. McCabe did not stop there. She also produced an expert report from Dr. David Axelrod. Dr. Axelrod noted that an MRI of Ms. McCabe's brain following the flu vaccination "revealed 3 right frontal subcortical white matter areas of hyper intensity, consistent with a demyelinating disorder." Exhibit 16 at 1. Dr. Axelrod

concluded that "the objective findings suggest dysfunction of parts of her nervous system" and that it "was caused by an immune response to the vaccine that resulted in damage/dysfunction of her central nervous system, including demyelinating disease." Dr. Axelrod proceeded to spend several pages of his report detailing how an immune response could cause this pathology. Id. at 2-4. The combination of the medical records, Ms. McCabe's affidavits, and the expert report from Dr. Axelrod provided a not insubstantial amount evidence in favor of Ms. McCabe's claim that she suffered from a vaccine-induced demyelinating disease.

To be sure, Ms. McCabe's evidence was not without problems. Although Ms. McCabe associated her presentation to the hospital on September 22, 2010 with the vaccination, the doctors who treated her there associated her condition to a viral infection. See exhibit 2 at 7. Similarly, while her MRI showed three white matter hyperintensities, the radiologist that interpreted the findings found them to be "nonspecific." Exhibit 1 at 100. This was consistent with the conclusions provided by several other treating neurologists, all of whom found her to be neurologically normal. See exhibit 1 at 106; exhibit 2 at 7; exhibit 8 at 8, 11.

These concerns about Ms. McCabe's claim were highlighted in Dr. Leist's report. Dr. Leist, a neurologist, also independently concurred with the assessments provided by Ms. McCabe's neurologists, concluding that she was not suffering from a neurological condition. Exhibit A at 10-11. As a neurologist, Dr. Leist was substantially more credible than Dr. Axelrod on the question of whether Ms. McCabe was suffering from a neurological injury.

When Ms. McCabe's original attorney requested interim fees shortly before withdrawing, the Secretary did not challenge that request. Speculating about the reasons for the Secretary's acquiescence is not necessary. However, the health of Ms. McCabe's former attorney was certainly a factor and the request for interim fees was filed before the Federal Circuit clarified the reasonable basis standard in Simmons, 875 F.3d 632. Regardless of the explanation, the absence of a challenge by the Secretary was noticeable.

In the decision granting interim fees, the undersigned declined to make arguments not made by the Secretary himself. See Greenlaw v. United States, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present"). The assertions made by Dr. Axelrod and Ms. McCabe in the reports and affidavits were taken at face value and the underlying basis for the claims was not scrutinized beyond the four corners of the document. See Interim Fees Decision, issued June 26, 2015, at 2 ("Dr. Axelrod's report (exhibit 16) fulfills the reasonable basis

standard in this case").  The dispute between the experts was chalked up to a battle of the experts, one that would be resolved through further reports and testimony.

Ultimately, Dr. Axelrod's reports turned out to be not based in fact.  After over a year of trying, Ms. McCabe was never able to identify a neurologist who would endorse the opinions expressed by Dr. Axelrod, most notably his opinion that Ms. McCabe had a demyelinating condition.  Indeed, Ms. McCabe ultimately decided to abandon Dr. Axelrod as an expert in her case, proceeding with new experts adopting new diseases and new theories for how the flu vaccine caused them.

### B. From a Demyelinating Injury to CFS

Ms. McCabe's second diagnosis, cytokine release syndrome, was a non-starter.  The diagnosis was made by Ms. Mikovits, who is not a medical doctor.  Dr. Whitton rebutted that it was without support in the record, and the condition was not raised again.  See Decision, 2018 WL 3029175, at *15-20.  Ms. McCabe's lack of reasonable basis to claim an injury of cytokine release syndrome does not appear to be in question.  People who lack medical training are not qualified to diagnose diseases.

Ms. McCabe's third diagnosis, CFS, seemed to have more teeth.  Indeed, Ms. McCabe ultimately proceeded to a hearing on this disease.  Ms. McCabe's CFS diagnosis was made by Dr. Levine, an expert in the syndrome.  CFS is a poorly understood disease.  It is also not particularly well-characterized, leading to several different diagnostic criteria with no one being the "gold-standard."  Id. at *37.  Though criteria vary, most require the patient to suffer from debilitating tiredness.  See, e.g., exhibit M1 (IOM report) at 72.[4]  Unlike the demyelinating condition and cytokine release syndrome, Ms. McCabe's record was replete with references that she complained of fatigue.  Indeed, practically every time that Ms. McCabe visited her primary care doctor, dating back to the very first records filed from 2006, she complained of insomnia, depression, and / or fatigue.

A foundational issue with Ms. McCabe's newest claim, however, was that no treating doctor ever diagnosed her with CFS.  Even Dr. Levine never examined Ms. McCabe or performed the necessary tests on her to determine if she met the

---

[4] In addition, different criteria will require that patients meet other requirements before a diagnosis of CFS can be made.  Commonly, these involve indicia of autonomic dysfunction.  See Decision, 2018 WL 3029175, at *37-43.  The main criteria used in this case are detailed in the decision.  Importantly, though not critically, Ms. McCabe was found to not meet any of the diagnostic criteria in the record.  Id.

criteria for the condition.  Indeed, as noted earlier, when Dr. Levine was asked, directly, what her basis was for determining that Ms. McCabe was experiencing debilitating symptoms related to CFS—a claim that Dr. Levine made repeatedly in her expert reports—she was unable to provide an answer.  Tr. 450.

Beyond the foundational issue of whether Ms. McCabe suffers from this amorphous condition, there is the more pressing question of what any of Ms. McCabe's reports of fatigue have to do with the flu vaccine she received on September 10, 2010.  Ms. McCabe's original petition and affidavits described her having an acute onset of symptoms associated with a demyelinating neurological condition following the September 11, 2010 vaccination.  Her petitions and affidavits did not describe new onset or significantly aggravated fatigue following the vaccination. These allegations did not appear until 2017, when her petition was amended to claim CFS as the injury for which she sought compensation.

The absence of any claim of new onset or significantly aggravated chronic fatigue in Ms. McCabe's affidavits and petitions prior to 2017 was entirely consistent with her medical records.  These records plainly evinced an image of a woman who suffered from ongoing fatigue, insomnia, and depression (though not necessarily the disease CFS) since the very first records submitted into evidence. To facilitate the process of drawing inferences from the textual records, the undersigned created a graph that visually represented the visits and complaints:



Dr. Levine struggled to explain how Ms. McCabe's medical records supported the conclusion that she was suffering from new onset or significantly aggravated CFS following the 2010 vaccination. Despite submitting four reports, Dr. Levine never adequately explained the basis for her conclusions. Her inability or unwillingness to do so is easily explained by reference to the figure above, which demonstrates the lack of medical record support for new onset or significantly aggravated CFS following the vaccination.

When pressed, Dr. Levine would simply list all the records she reviewed and make conclusory statements such as "Thus, the complaints reported by the patient in the above Exhibits match the symptoms and exclusionary criteria contained in the case definitions provided in References 1 and 2." Exhibit 72 at 2. When pressed again for more specificity, Dr. Levine simply made things up. She stated that Ms. McCabe complained of "worse" or "worsening" insomnia. Exhibit 80 at 1; exhibit 90 at 1. But, in fact, the records that Dr. Levine was referencing made no reference to Ms. McCabe's condition "worsening"; instead the records simply mentioned that Ms. McCabe was continuing to complain of these conditions, as she had been in the majority of her visits, since her earliest medical record filed in this petition. See exhibit 1 at 2-12.

Dr. Levine was placing great emphasis on the portrayal of Ms. McCabe provided by her and her counsel. When Dr. Levine was being asked by the Secretary's counsel to justify her conclusion that Ms. McCabe was suffering from ongoing debilitating symptoms of CFS and was unable to provide an answer, Mr. Shoemaker interjected to say: "I think included in the affidavits and also, Your Honor, a description that we provided to her of her current condition as well, when she was working part-time and was still quite debilitated from the illness." Tr. 450. It appears that Dr. Levine was taking liberties with the medical records because of the self-history Ms. McCabe and her attorney provided.

The presumption that medical records are accurate is rebuttal with strong evidence. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993); Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779 (2006). Unfortunately, the evidence Ms. McCabe presented—her testimony—was far from persuasive. Ms. McCabe was not a credible witness nor a credible historian of her condition. As discussed in the decision, she repeatedly made statements that contradicted her own testimony and the underlying record. She provided a portrayal of herself that was inconsistent with not only the medical records, but her own expert's assessment of her condition. See Decision, 2018 WL 3029175, at *44-46. Her testimony appeared rehearsed. Id. In sum, nothing Ms. McCabe said could be credited merely for the fact she said it.

The divide between petitioner's unsubstantiated averments and the contemporaneously created records undermines petitioner's claim that a reasonable basis exists for her claim that the 2010 flu vaccine caused or significantly aggravated her CFS.  See Murphy, 30 Fed. Cl. at 62.  Here, as in Murphy, the documentary evidence is directly at odds with the claims brought by Ms. McCabe.  When claims are not rooted in fact, there is not a reasonable basis for those claims.

Ms. McCabe's argument that the numerous expert reports she submitted provides her with reasonable basis is also unconvincing.  Although expert opinion *can* provide petitioners with a reasonable basis to file a petition—and in practice is often essential in the analysis—the fact an expert opinion was submitted does not end the analysis.  See Perreira, 33 F.3d at 1377 (noting that when the expert's opinion of an association between the vaccination and the injury is "mere speculation," the statute does not envision reimbursement for fees and costs incurred in bringing the petition).  Accordingly, reasonable basis does not automatically follow from the very fact that Ms. McCabe filed nearly a dozen expert reports.

The opinions submitted by Dr. Levine and Ms. Mikovits were not simply less convincing than the opinions submitted by the Secretary's experts.  Cf. Dominguez, slip op. at 13, 16-20 (finding reasonable basis despite unpersuasive opinion provided by Ms. Mikovits).  Instead, the opinions were largely based on untruths.  Both experts adopted as true a version of events that was not corroborated by facts in the record or adopted a facially implausible version of events provided by the petitioner.  In drawing their conclusions, the experts ignored or misrepresented the documentary evidence that directly contradicted the argument they were attempting to make.  When experts do so, petitioners cannot rely on the experts' testimony to establish reasonable basis.  See Murphy, 30 Fed. Cl. at 62.

Ms. McCabe's experts were deficient not only in their reliance on facts not in the record, but also their inability to address fundamental issues in Ms. McCabe's case.  One of the more salient examples was Ms. McCabe's failure to present a single diagnostic criterion for CFS for which she met the requirements.  See Decision, 2018 WL 3029175, at *36-42.  This deficit was particularly salient since no treating doctor ever diagnosed Ms. McCabe with CFS and because the CFS claim appeared in the middle of the litigation after her claim of a very different injury was effectively foreclosed.

Ms. McCabe's fees brief does not meaningfully engage with the undersigned's concerns about the credibility of her experts and their seeming

reliance on facts not in the record.  Instead, she places substantial emphasis on two instances where the undersigned remarked about the evidence she had submitted in the record and attempts to rely on these statements to prove the reasonable basis of her petition.  Both are unpersuasive.

First, Ms. McCabe cited the undersigned's award of interim attorneys' fees in 2015 as evidence of the reasonable basis for her continued litigation.  As an initial matter, it is now well-settled law that the reasonable basis of a petition can come and go throughout the proceedings based on the evidence in the record.  R.K. v. Sec'y of Health & Human Servs., 760 F. App'x 1010, 1012 (Fed. Cir. 2019); Perreira, 33 F.3d at 1377.  Thus, at the very least, the earlier determination does not bind the analysis now.  Furthermore, since the interim fees decision, Simmons has refined the reasonable basis standard.

More critically, petitioner's argument borders on being disingenuous in several ways.  First, petitioner's brief does not mention that the award of interim fees adopted a stipulation by the parties.  Second, petitioner's brief does not mention that the Secretary agreed to the stipulation under consideration of the "particular circumstances" of the motion, including it being precipitated by Ms. McCabe's first counsel's withdrawal from the case due to his poor health.  Third, it ignores that reasonable basis for the petition at that time was founded solely upon Dr. Axelrod's opinion that Ms. McCabe suffered a demyelinating condition that was the result of the 2010 flu vaccine.  However, even Ms. McCabe has abandoned the claim of a demyelinating injury because she was unable to support it with evidence.  Her attempt to now rely on the 2015 interim fees decision to prove up the reasonable basis for a completely different claim is specious.  Finally, the withdrawal of one attorney provides an opportunity for a potential successor to analyze the evidence dispassionately.  See Rehn v. Sec'y of Health & Human Servs., No. 14-1012V, 2017 WL 1011487, at *6 (Fed. Cl. Mar. 2, 2017) (denying motion for review of decision finding no reasonable basis and stating the original attorney's "withdrawal from the case without finding a credible expert thus acted a 'signal' to [the successor attorney] about the weakness of the case").

Second, Ms. McCabe also twice cites, in support of reasonable basis, a statement the undersigned made in an order dated August 1, 2017.  To put the cited sentence in context, the first paragraph of the order is provided below:

Due to problems with Dr. Levine's report dated July 3, 2017, the undersigned believes that the hearing set for Wednesday-[Friday], October 18-20, 2017, cannot proceed as scheduled. The present order,

however, does not cancel the hearing. Instead, a status conference is
set to obtain the views of the parties.

Order, issued Aug. 1, 2017, at 1.  The order proceeds to explain the reasons why
Ms. McCabe's hearing was at risk of being cancelled.  One of the major reasons, as
communicated in the order, was that Dr. Levine's reports had large gaps.  One
specific concern with Dr. Levine's reports was that the symptoms in the medical
records on which she was relying to diagnose Ms. McCabe with CFS (insomnia,
depression, and fatigue) also appeared throughout the earliest medical records
submitted by Ms. McCabe, dating back to 2006.  If the same symptoms Dr. Levine
cited to support the CFS diagnosis were present before the vaccination, Ms.
McCabe could seemingly not pursue a claim of causation-in-fact.  As
communicated in the order:

> On October 2, 2006, Ms. McCabe reported "depression," "insomnia,"
> and "fatigue." Exhibit 1 at 2.  According to Dr. Levine, insomnia is a
> key symptom of chronic fatigue syndrome.  Exhibit 80 at 1.

> Thus, it appears that Ms. McCabe already suffered from chronic
> fatigue syndrome in 2006. If so, then Ms. McCabe cannot claim that
> the September 11, 2010 flu vaccine caused her chronic fatigue
> syndrome. If so, then Ms. McCabe must be asserting a cause of action
> that the September 11, 2010 flu vaccine significantly aggravated her
> pre-existing chronic fatigue syndrome.

Id. at 2-3.  Because Ms. McCabe's proof did not address significant aggravation,
she was warned that "there is another gap in petitioner's case."  Id. at 3.

The undersigned provides this context so that Ms. McCabe's use of the
undersigned's own words can be put into a broader perspective.  In her brief in
support of the reasonable basis for the petition, Ms. McCabe argued:

> Further, it should not be over zealous representation to proceed to
> hearing on the theory that Ms. McCabe had chronic fatigue syndrome
> when 1) the Special Master noted "Thus it appears that Ms. McCabe
> already suffered from chronic fatigue syndrome in 2006." (August 1,
> 2017 order at 2-3) and [Dr. Levine diagnosed her with CFS].

Pet'r's Reply, filed May 13, 2019, at 9 (emphasis added).

Ms. McCabe's use of this single sentence of the undersigned's remark to
convey support for the CFS diagnosis and the reasonable basis for the petition is
mistaken.  Provided in context, the order was attempting to communicate to Ms.

McCabe that her hearing was in peril of being cancelled due to fundamental gaps in her proof.

In sum, the undersigned finds that Ms. McCabe's case (at least after the withdrawal of the initial counsel) was not pursued with a reasonable basis. An evaluation of the evidence underlying her claim makes plain that her experts based their conclusions on a narrative of events—where Ms. McCabe was in great health until being stricken down by the September 11, 2010 flu vaccine—that was without support in the record. The support provided for this narrative rested almost entirely on the averments of a single person: Ms. McCabe. However, her testimony was repeatedly controverted. It was controverted by the facts, by her experts, and even by herself. When a claim is pursued based on underlying factual premises that are not true, the claim cannot be said to possess a reasonable basis.

A salient aspect of Ms. McCabe's petition is that the October 2017 hearing made her case for entitlement weaker. The hearing laid bare the weakness of her experts' testimony, and, more importantly, the hollowness of her own. In this way, the hearing achieved its objective of clarifying the record so that a decision could be made.

This progression of events illustrates the perils of making reasonable basis determinations before the factual record is complete. In this case specifically, delaying adjudication of Ms. McCabe's motion for a determination of reasonable basis turned out to be the right decision, for the hearing not only provided new information, but it provided information that affected the credibility of statements previously made by petitioner and her witnesses.

Ms. McCabe's petition also presents one of the rare cases where the good faith of the petitioner must be questioned. The good faith requirement of the Vaccine Act's attorneys' fees provision is not well-developed for the very fact that, fortunately, few cases present this issue. From what case law exists on the standard, petitioners cannot obtain reimbursement of their fees and costs for claims brought without an honest belief that the vaccine caused the injury they claim. See Hamrick, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). Assessing subjective beliefs is exceedingly difficult and doing so may involve deduction from the observable behavior of the petitioner. For example, in Turner, the special master based on her finding of good faith on emails between the petitioner and counsel that evinced a sincere belief in the claim. See Turner, 2007 WL 4410030, at *6.

Here, deducing petitioner's beliefs from her conduct supports a conclusion that this petition was not pursued with good faith. Ms. McCabe initially brought a

claim of a demyelinating injury. After years of trying, she was not able to support
this claim. It was only then that she transitioned to a claim of cytokine release
syndrome. Once again, it was only when she could not support that claim that she
shifted to her final claim of chronic fatigue syndrome. Along the way, Ms.
McCabe filed new affidavits that changed her complaints based on what she was
seeking compensation for. Compare exhibit 91 (claiming ongoing extreme
fatigability) with exhibit 13 (describing her condition as "GBS, nerve damage,
sleeping problems, chronic inflammatory respiratory problems, memory loss and
walking problems"). To be sure, the treating doctors did not diagnose Ms.
McCabe with any of these conditions. To support these claims, Ms. McCabe
submitted expert reports that contained characterizations of the record that she
knew, or should have known, were false. Even more, Ms. McCabe provided
testimony regarding her alleged CFS that was inconsistent with her own statements
regarding her condition. Her testimony also appeared led by counsel towards a
pre-conceived answer. See Decision, 2018 WL 3029175, at *44-46. Based on
these observations, Ms. McCabe's claim that the September 11, 2010 flu vaccine
caused her to develop, or significantly aggravated, CFS was not pursued in good
faith. See Gilead Sciences, Inc. v. Merck & Co., Inc., 888 F.3d 1231, 1240 (Fed.
Cir. 2018) (ruling that a district court did not abuse its discretion in finding patents
were not enforceable due to unclean hands).[5]

\*   \*   \*

Ms. McCabe filed her petition for compensation almost exactly six years
ago. The resources expended on this petition exceed the $180,000 being requested
by the petitioner here. The resources spent adjudicating this petition are even more
concerning when the backlog of petitions in this Program are taken into
consideration.

The undersigned respects counsel's desire to zealously represent his client.
However, zealous representation is not what occurred here. What occurred was,
largely, a continuous misrepresentation of the underlying facts in search of a
colorable claim of a vaccine injury. Those misrepresentations were made not only
by petitioner's experts, but by the petitioner herself. While Ms. McCabe
emphasizes that her experts filed many reports (Pet'r's Reply, filed May 13, 2019,
at 10), the number of reports, in this case, indicates that the experts could not

---

[5] In Gilead, the Federal Circuit warned that the doctrine of unclean hands should not
overtake "relatively commonplace disputes over credibility." So, too, here, the finding of a lack
of good faith is not based simply or exclusively upon Ms. McCabe's lack of truthfulness.

answer basic questions in a straightforward manner.  For example, Dr. Levine's persistent failure to disclose the diagnostic criteria for chronic fatigue syndrome on which she was relying in diagnosing Ms. McCabe should have alerted counsel to the weakness of Dr. Levine's opinion.

When Congress decided to implement a Program wherein unsuccessful petitioners would have their fees and costs reimbursed by the taxpayer, Congress envisioned a Program wherein able attorneys would not be dissuaded from taking on difficult to prove cases bereft of scientific certainty regarding the underlying injuries that are being alleged.  Saunders v. Sec'y of Health & Human Servs., 25 F.3d 1031, 1036 (Fed. Cir. 1994).  The undersigned's evaluation of the reasonable basis and good faith for Ms. McCabe's claim takes seriously this wish by Congress that petitioners not be penalized for bringing claims that come up short on their proof.

Put another way, while Ms. McCabe did not provide persuasive evidence that the flu vaccine she received could cause CFS, that is not the issue here.  As noted in the underlying entitlement decision, CFS may very well have an immunogenic basis and vaccine reactions have immunologic consequences; it is accordingly not inconceivable that one could have an effect on the other.  Future research may uncover a connection (or it may not).  The problem with Ms. McCabe's petition is that she pursued it without any allegiance to the underlying facts of her case.  For that, her petition cannot be said to be pursued with a reasonable basis and in good faith.  Accordingly, she is not entitled to reimbursement of her fees and costs.

## VI.   **Conclusion**

For the reasons explained above, the undersigned finds that Ms. McCabe's claim that the September 11, 2010 flu vaccine caused or significantly aggravated CFS was not maintained in good faith and was not supported by a reasonable basis.  Accordingly, she is not entitled to compensation for her attorneys' fees and costs and her motion must be DENIED.  42 U.S.C. § 300aa-15(e)(1).

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master